IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 4, 2025

**STATE OF TENNESSEE v. JULIAN SUMMERS**

**Appeal from the Criminal Court for Shelby County**
**No. 22-05091        Carlyn L. Addison, Judge**

_____

**No. W2024-00830-CCA-R3-CD**

_____

Defendant, Julian Summers, was convicted by a Shelby County jury of first degree murder, tampering with evidence, and abuse of a corpse. As the thirteenth juror, the trial court affirmed the verdicts as to the first degree murder and abuse of a corpse but dismissed the verdict as to tampering with evidence. The trial court sentenced Defendant to a total effective sentence of life imprisonment plus two years. On appeal, Defendant claims that 1) the trial court erred in denying his motion to suppress his video-recorded statement to the police; 2) the trial court abused its discretion by permitting the State to call the forensic evaluator as a rebuttal witness; 3) the evidence was insufficient to support his first degree murder conviction; and 4) the trial court abused its discretion by imposing consecutive sentences. Upon review of the entire record, the briefs of the parties and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Mark Mesler, Memphis, Tennessee, for the appellant, Julian Summers.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Steve Mulroy, District Attorney General; and Regina Lucreziano and Katie Ratton, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On December 6, 2022, the Shelby County Grand Jury entered a true bill charging Defendant with first degree murder (count one), tampering with evidence (count two), and abuse of a corpse (count three). Defendant met the victim, Bruce Jefferies, through a social meeting app. Sometime after Defendant moved into the victim's apartment, Defendant struck the victim on the head with a hammer, decapitated him, and loaded the victim's dismembered body into a suitcase which he left by a dumpster. Defendant was taken into custody after he was seen on a bridge appearing to be considering jumping. He was taken to the interview room of the Memphis Police Department ("MPD") where he talked to two investigators.

*Motion to Suppress*

On November 13, 2023, Defendant filed a pretrial motion to suppress his statement to the investigators, alleging that after he "told the investigators multiple times that he would need to talk to an attorney," investigators declined to stop the interview. The State responded that Defendant's requests for an attorney were equivocal or ambiguous, and that Defendant's requests for an attorney were confined to questions about his family.

Sergeant Freeman, a twenty-three-year veteran with the MPD, was the lead investigator on the case and testified at the December 14, 2023 suppression hearing. The interview with Defendant was conducted on December 28, 2021, by Sergeant Freeman and his partner, Sergeant William Burdett. The interview was recorded on Sergeant Freeman's body camera and was introduced and played for the jury during his testimony. The record reflects that the trial court watched the entire video, but at the hearing, the interview was cued to the portions where Defendant requested an attorney or declined to answer questions.

Sergeant Freeman testified that Defendant asked for an attorney but "[o]nly on certain questions he didn't want to answer." Specifically, Defendant stated that he wanted an attorney to answer questions about his family. According to Sergeant Freeman, Defendant chose "to tell us his story." Once he began telling "his story," Defendant did not again request an attorney. Sergeant Freeman confirmed that he had reviewed his video of the interview prior to the hearing.

The recording showed that Defendant was handcuffed when he entered the interview room. Sergeant Freeman identified himself and Sergeant Burdett. Defendant

and Sergeant Freeman both wore face masks.[1]  Defendant pushed his mask below his chin when he spoke.  Sergeant Freeman kept his mask on and Sergeant Burdett did not wear a mask.  After noting Defendant's name and date of birth, Sergeant Freeman asked Defendant whether he was "okay" because Defendant appeared "kind of down."  Both officers left the interview room briefly and returned to advise Defendant of his rights. Defendant stated that he graduated from high school.  At the direction of Sergeant Burdett, Defendant read the advice of rights and waiver form aloud.  Sergeant Burdett asked Defendant if he understood what "coercion" meant.  When Defendant did not respond, Sergeant Burdett explained that "coercion" is where "we're trying to threaten you or make you talk to us."  Sergeant Burdett assured Defendant that he could end the interview at any time.  When Defendant read the section on "the right to remain silent," Sergeant Burdett again assured Defendant that Defendant could stop the interview, "at any time."  Defendant verbally confirmed that he understood the listed rights and signed the waiver of rights form.

Sergeant Freeman then asked Defendant why he was on the bridge and Defendant responded that he was "highly upset."  Initially, Defendant said he did not want to talk about why he was upset, but then he stated that he was upset because his family and friends were "dead."  Sergeant Burdett asked whether "all" of his family and friends were dead, and Defendant nodded his head affirmatively.  When Sergeant Burdett asked Defendant his family members' names, Defendant responded, "I don't want to answer that question right now."  Defendant continued to insist that he would not provide the names of his dead family and friends:

Defendant:          I think it would be [indecipherable].  I'm not going to answer that question right now.  I want a lawyer.

Sergeant Freeman:  You what now?

Defendant:          I want a lawyer.

Sergeant Freeman:  You want a lawyer?

Defendant:          Certain questions I will answer, certain questions I just won't.

When asked about his living arrangements, Defendant said he was homeless. Sergeant Freeman then asked if Defendant had close family nearby or someone he could

---

[1] The interview occurred during the COVID-19 virus pandemic where face masks covering the nose and mouth were either required to be worn or commonly worn to prevent the spread of the virus.  Because Sergeant Freeman kept his mask on during the interview, his words were often muffled by the mask.

talk to. Defendant responded, "It sounds insane but that's as much detail as I want to answer." When asked whether specific members of his family were dead or why Defendant believed they were dead, Defendant repeatedly replied, "I don't want to answer that question." When asked whether Defendant knew they were dead because he had recently tried to speak or visit them, Defendant replied that he had seen "ghosts" of his mother and sister suggesting that they were dead. He followed his answer by saying again that he did not want to answer, "that question." Sergeant Freeman then stated, "We can't help you if you don't tell us what's going on."

Sergeant Burdett then asked Defendant, "What would you say if we told you we talked to your mother and sister and they're not dead?" Defendant did not reply. Sergeant Freeman then advised Defendant, "If I see ghosts, I would want to talk to someone." Defendant looked at Sergeant Freeman and stated, "We are not alone. Things. I just choose not to answer that question." Sergeant Freeman encouraged Defendant to talk, "Can you set yourself free by answering those questions? Sometimes ghosts will torment you because you choose to hold stuff in." Defendant then revealed that he had heard "voices" telling him what he had seen in his "visions." In his "visions," he had seen someone "hurt his sister." When asked to identify who had harmed his sister, Defendant stated, "I'm gonna need a lawyer. This is all designed to make me look crazy." Sergeant Burdett asked Defendant whether he needed a lawyer "for everything or just that question?" Defendant remained silent for almost one minute before saying, "I would like to share a story."

Defendant immediately then stated, "In the beginning of 2020, it's as if I woke up. And everybody hate (sic) me." Defendant did not ask for an attorney for the remainder of the interview. Several times he said that he was "not supposed to talk," or "not supposed to talk about *this*" meaning the "ghosts" or "entities" he claimed had been threatening to kill Defendant and his family. Defendant provided more detail about the "entities" later in the interview as he confessed to killing the victim. Sergeant Freeman assured Defendant that he was safe in the interview room and encouraged Defendant that he would "feel better" if he talked. Defendant stated that he had been called "blood of the lamb" and "child of God," and asked the officers whether they were familiar with the Book of Revelations in the Bible. He admitted that it was "hard to explain." He maintained that he had been bitten in the neck and legs, but he did not know what was biting him; he pulled down the collar of his hooded sweatshirt claiming that he had marks from the bites.

Defendant eventually talked about how one of his friends had become a "completely different person" after a hospitalization; the friend stopped eating and bathing. Defendant did not identify this person by name, but it became clear later in the interview that Defendant was talking about the victim.

During the interview, Defendant stopped talking to ask why he was in the homicide office and if they wanted to talk about "the bridge" and how he was found. Sergeant Freeman told him, "All of it." Sergeant Freeman told Defendant that the officers who found Defendant on the bridge had the impression that Defendant was going to jump. Defendant admitted that he was crying and "upset about what was going on," that people had threatened to harm and discredit him. Defendant denied that he was planning to jump from the bridge.

After the officers returned to the interview room following a short break, Sergeant Freeman asked Defendant about the friend he referenced earlier. Defendant identified the "friend" as "Brucie" and said that he and "Brucie" lived together. He then provided the victim's full name, Bruce Jeffries, and described the victim's apartment. Defendant slept on a pallet in one bedroom while the victim slept in another room with a bed. Defendant stated that he left the apartment because something was trying to kill him. He made clear that the victim never harmed him. He identified himself, the victim, and the victim's apartment in several photographs shown to him by the officers.

Sergeant Burdett brought Defendant's attention back to the victim and how Defendant was trying to "avenge him." Defendant stated again that they were "not alone" and recounted the victim's physical decline following his hospitalization. Defendant described the victim as a "wise man," but said the victim had become "possessed" by the "entities." The same "entities" who "possessed" the victim began following and threatening Defendant. Defendant insisted that he was not "possessed" during the interview.

The officers showed Defendant a picture of a person leaving the victim's apartment with a suitcase[2] and Defendant identified himself in the photograph. The following exchange then occurred:

Sergeant Freeman: What was in the suitcase?

Defendant: A body.

Sergeant Freeman: Whose body?

Defendant: [The victim]'s.

Sergeant Freeman: How did [the victim]'s body get in there?

---

[2] Based on the proof at trial, the photograph of Defendant was most likely a screenshot taken from a residential Ring camera footage or the apartment complex surveillance cameras.

Defendant said that he was being attacked and that he "panicked" and hit the victim in the head with a hammer he grabbed from the kitchen while the victim was lying in his bed. Defendant insisted it was "the right thing to do." He said that one of the ten invisible "entities" took over the victim's body while the remaining "entities" surrounded Defendant. According to Defendant, the "entities" instructed him to chop off the victim's head. Defendant recalled that the victim was still breathing after Defendant struck him with the hammer. He grabbed a "kitchen steak knife" to "finish the process." Defendant stated that "this wasn't supposed to happen." He believed that he was supposed to die and that the authorities would have found two bodies instead of just the victim's. Defendant's voice broke, and he began to cry. He believed that the "entities" attacked him and the victim "because [of] their relationship." He acknowledged that he took the suitcase with the victim's body to a dumpster and left it there. The "entities" however continued to follow Defendant.

Near the end of the interview, Defendant stated that he had never harmed anyone except the victim. He denied having harmed any of his family or friends.

Sergeant Freeman was cross-examined after the recording of the interview was played. He testified that the officers who were dispatched to the bridge informed him that Defendant was found sitting on top of a local overpass, not a bridge over the Mississippi River. Sergeant Freeman agreed that the original dispatch indicated that Defendant was going to jump. However, during the interview, Defendant told him that he was seated on the bridge "dangling his feet" and was not planning to jump.

At the conclusion of the hearing,[3] the trial court denied the motion to suppress Defendant's statement finding that Defendant's request for counsel was equivocal and ambiguous.

*Trial – February 12-16, 2024*

The basic facts of the killing are not in dispute. The proof at trial examined how the killing came to light, how Defendant was identified as the sole suspect, and Defendant's explanation for killing the victim.

---

[3] During a jury-out hearing on the second day of trial, it came to the trial court's attention that the order denying the suppression motion could not be found in the court file. In a brief discussion about the preparation of the order it appeared that the trial court emailed the order to the parties to review prior to entry; defense counsel stated that he had "looked at it." The trial court concluded the matter by stating, "We'll figure out and we'll have a complete record by the time we complete our business." There is no written order in the record.

On December 12, 2021, around 10:30 and 11:00 a.m. in the morning, Timothy Kitchens took his dog for a walk and saw Defendant pulling a suitcase down an alley. Mr. Kitchens was not acquainted with Defendant, but he had seen Defendant around the neighborhood in the seven months before the victim's death. Mr. Kitchens thought Defendant was unhoused because he lived close to the Social Security office and "figured most of the traffic might have been homeless people." Mr. Kitchens estimated that he got as close as fifteen to twenty feet to Defendant and briefly made eye contact with him. At trial, Mr. Kitchens looked at video footage from a Ring camera of the alley from that morning. He and his dog are not shown in the footage, but Mr. Kitchens identified the frame of the footage when Defendant looked up to his left at the point they made eye contact. The footage was published to the jury and showed Defendant dressed in a white hooded sweatshirt, carrying a backpack, and pulling a suitcase.

Mr. Kitchens assumed the luggage contained something heavy because Defendant "was dragging it but he'd … run out of breath. He'd have to stop every so often. . . . It just looked like it weighed a whole lot." Defendant dragged the suitcase down the alley where there was a Regions Bank and the alley "kind of dead ends to where the dumpster is." He saw Defendant try to throw the bag away. Mr. Kitchens testified that the bag "probably weighed 220 something pounds because [Defendant] couldn't pick it up above his waist." He saw Defendant throw the bag on the ground and then run away taking a left on Union. Mr. Kitchens "went about [his] day," and when he took his dog for a walk later that night, he saw police cars around the dumpster and then gave police a description of what he had observed earlier that morning.

Authorities were first alerted to the suitcase after 5:00 p.m. on December 12, 2021. MPD Officer Randy Taylor, a member of the Crump Task Force, had just completed a traffic stop when a man approached his car window and told him that there was a dead body inside a suitcase beside a dumpster behind the Regions Bank. Officer Taylor was working in the Midtown area with fellow officer Stephen Owens. Officer Taylor and Officer Owens were in separate squad cars and drove to the dumpster behind Regions Bank. Officer Taylor carefully unzipped the suitcase and found the body of a black male inside. When Officer Taylor arrived at the dumpster to investigate, the man who reported the dead body was also there. The man was secured in a patrol car but was not considered a suspect. Officer Taylor canvassed the area for witnesses and surveillance footage as more officers arrived to cordon off the area around the dumpster.

MPD Officer Chris Davenport, the crime scene investigating officer tasked to survey and document the scene and collect evidence, first went to the crime scene and photographed the area and the body in the suitcase. He was then directed to an apartment complex located southwest of the dumpster where the suitcase had been found. He marked droplets of what appeared to be blood on the top of the stairs on the first landing and then

back down the stairs. The trail of blood led to a dumpster inside the apartment complex and there were "red droplets that was possibly blood near that dumpster as well." The trail then went down the alley to the back of the bank building and the dumpster where the suitcase was found. Officer Davenport testified that the distance between the dumpster behind the bank and the apartment complex was approximately 100 feet. Officer Davenport observed that the most concentrated amount of blood was found at the apartment complex dumpster where there was what he believed to be a possible shoe print in the red substance.

The apartment that was cordoned off was leased to the victim. The apartment manager alerted Borris Earl Jeffries, Sr., one of the victim's five siblings. Borris[4] arrived at the victim's apartment where he spoke to the police. He gave a statement at the apartment complex and at the police station. He also identified Defendant in two photographs. Borris had met Defendant four times and informed the police that Defendant had been living with the victim for about one and a half years. Although Borris described Defendant as the victim's "boyfriend" in his statements to the police, at trial, he maintained that he did not recall describing Defendant as a "boyfriend." He knew only that they had a "close relationship." Borris had last seen the victim on Thanksgiving 2021. The victim was diabetic, but he was not taking his insulin and was losing weight.

MPD Officer Lee Walker obtained a warrant to search the victim's apartment. It was a two-bedroom apartment with a kitchen and one bathroom. One bedroom had a mattress and box springs with the linens removed. The second bedroom had a pallet. Officer Walker testified that there was a suitcase matching the suitcase found by the dumpster at Regions Bank. The suitcase contained documents belonging to Defendant, including a copy of his 2019 tax return, a receipt from the Collierville Municipal Court, a notice for a court date on September 30, 2021, and a book titled, "A Pineal Gland: the Eye of God." The suitcase also contained a pair of black Adidas running shoes with what appeared to be blood on them.

Officer Walker documented a broken mirror above the vanity in the bathroom with glass fragments on the floor between the tub and the toilet along with a shoe imprint in what appeared to be blood on the bathroom floor. Officer Walker testified that the same substance was found in the victim's bedroom, the kitchen, and the laundry room. In the room with the bed, the bed had been stripped of its linens, and blood was observed on the mattress, the box spring, pillows, the floor, the wall, clothing, and several shoe boxes stacked up against the wall.

---

[4] Three of the victim's relatives testified at trial or at sentencing. Because all three witnesses share the same surname as the victim, we will refer to these witnesses by their first names to avoid confusion. No disrespect is intended.

In the kitchen, there appeared to be blood in the sink along with two knives that were collected and exhibited at trial, a large butcher knife and a smaller knife. The larger knife was twelve inches long with a seven-inch blade; the second knife was nine inches long with a five-inch blade. In the laundry room, there appeared to be blood on the floor between the washer and dryer. Inside the washing machine was a t-shirt with possible blood stains. There was a trash bag next to the washing machine; it was emptied and included a white bag with possibly blood. A hammer was not found.

Officer Walker photographed the contents of the suitcase when it was brought to the morgue. The suitcase contained a human body "folded up," a severed head, and personal effects that were on the body including a watch, an earring, a ring, $60 in currency, and a check written to "MLGW."

Danielle Harrell, an assistant medical examiner for the West Tennessee Forensic Center, was tendered as an expert in forensic pathology and as a keeper of the records without objection. An autopsy of the victim's body was conducted on December 13, 2021. Dr. Harrell was present during the initial external examination when the body was removed from the suitcase, but she did not conduct the autopsy. She reviewed the case file which included the autopsy report and an anthropology report.

The victim's cause of death was blunt force and sharp force injuries to the head and neck and the manner of death was homicide. Dr. Harrell testified that the victim sustained blunt force injuries to the left side of the head; the skull was fractured into multiple pieces which injured the brain. The victim also sustained a laceration in the skin at the hairline. The autopsy showed that the skull was pushed in from the blunt force. Dr. Harrell testified that it was "plausible" that the injuries to the skull were consistent with being struck with a hammer. The victim also sustained sharp force injuries to the head and neck. The head was separated from the rest of the body. The tissue around the neck or top of the spine was yellow which suggested that the decapitation occurred postmortem. No defensive wounds were recorded, and Dr. Harrell saw none in reviewing the case. Dr. Harrell explained that ascertaining the time of death was not feasible based on the autopsy findings. Photographs of the suitcase and the victim's body as they arrived at the forensic medical office and before the autopsy were exhibited to the jury.[5]

Dr. Harrell also testified about the findings of Dr. Benjamin Figura, the forensic anthropologist who conducted the anthropologic examination. Dr. Figura examined the head for the skull fractures and determined that the skull fracture was consistent with "at least one impact to the head." Dr. Figura examined the victim's cervical vertebrae and the injury pattern on the bone to determine how the injury pattern occurred. Dr. Figura

_____

[5] The collective exhibit of the autopsy photographs was admitted over the defense's standing objection.

observed sharp defects along the lower part of the victim's spine consistent with a knife. And based on the injury pattern on the spine, Dr. Figura determined that the knife marks were consistent with a "front to back direction of force" or the head being cut from front to back.

On cross-examination, Dr. Harrell confirmed that a toxicology screen was conducted on the victim's liver tissue and contained alcohol and a metabolite of marijuana. She could not determine if the victim was impaired at the time of death. Dr. Harrell also confirmed that the blunt force trauma to the head would have been fatal and that medical attention immediately after the blow was unlikely to have allowed the victim to survive to "any functional state."

On redirect examination, Dr. Harrell maintained that the blow to the head would have been "lethal" although the autopsy report stated that the cause of death was a combination of the blunt force to the head and the sharp force trauma to the neck. On recross examination, Dr. Harrell added that there was a hemorrhage in the head which favored the likelihood that the victim was alive during the skull injury.

Sergeant Burdett testified about Defendant's interview and the investigation. He went to the crime scene the day after the suitcase was found by the dumpster. He and other investigators canvassed the area for surveillance footage or witnesses. They also followed the trail of blood from the dumpster to the Broadmoor Apartments. At the Broadmoor Apartments, investigators followed the trail of blood to a staircase that led to the back door of an apartment.

Sergeant Burdett was not present when Defendant was taken into custody. Sergeant Burdett testified that a crisis intervention team ("CIT") officer trained in responding to calls involving mental health emergencies observed Defendant walking on the Union Street Bridge. The officer stopped to talk to Defendant who was "visibly upset." The CIT officer entered Defendant's name in the police database and learned that Defendant was a person of interest. Defendant was brought to the homicide bureau where he was interviewed by Sergeant Burdett and Sergeant Freeman. The victim's body was found on December 12, 2021; Defendant was interviewed on December 28, 2021.

Sergeant Burdett testified that Defendant was advised of his rights, waived them, and agreed to talk to the officers. The advice of rights and waiver of rights documents bearing Defendant's signature and initials were admitted as exhibits. Sergeant Burdett recalled that Defendant "seemed more knowledgeable than most people" about his rights because he insisted that there would be questions he would not answer. The recording of the interview was played for the jury. The parties agreed to publish an edited version of the interview cutting out the sections where Defendant was alone in the interview room.

Sergeant Burdett's testimony at trial was similar to that given by Sergeant Freeman at the suppression hearing. Sergeant Burdett testified to his recollection of the interview and provided background information for some of the questions Defendant was asked. Sergeant Burdett explained that because of Defendant's state when he was found on the bridge and information that he appeared to be about to jump, Defendant was asked whether he had any family or friends to whom he wanted to talk. Although Defendant replied that all the members of his family were dead, Sergeant Burdett testified that he had talked to Defendant's mother between the time the victim was apprehended and the interview. Defendant's mother stated that she had not seen Defendant in "quite some time" and that the two of them did not talk.

Sergeant Burdett testified that during the interview, Defendant pulled down his collar and showed his neck, but Sergeant Burdett did not see any bite marks. Because Sergeant Burdett did not have Defendant remove his clothes, he was unable to verify whether Defendant had bite marks on his legs as reported.

Sergeant Burdett agreed that he found Defendant's story to be "unusual" but declined to pass judgment on Defendant's mental health because he lacked the qualifications to make a diagnosis or render an opinion. Sergeant Burdett maintained that in taking a statement, he "let[s] people tell [him] their story in their way[.]" He focuses on whether the person gives a detailed statement about what happened, the scene, or what they witnessed.

During the investigation, officers had obtained security footage of the apartment complex. The edited footage was exhibited to Sergeant Burdett's testimony and clips from different angles were published to the jury. One clip showed the suitcase at the back gate of the apartment complex. Sergeant Burdett explained that Defendant had first tried to put it in the dumpster behind the apartment complex. Although Defendant was seen leaving the apartment with a backpack, the backpack was not recovered. A butcher knife and a long kitchen knife were found in the kitchen sink of the victim's apartment.

After the State rested its case, Defendant testified that he was thirty-two years old and that he had lived in Memphis his "whole life." He graduated from high school and attended two to three years of college. Defendant met the victim in 2017 on a social dating app which he joined to make new friends. He insisted that he was in a relationship with someone else at the time and was not looking for a romantic relationship. Defendant and the victim did not date but became "great friends." The victim was sixty-three years old.

Defendant moved in with the victim at the end of 2019 when Defendant's romantic relationship broke up. Defendant needed a place to stay, and the victim offered to let Defendant move in. Defendant paid a portion of the rent in exchange for housekeeping,

cooking, and grocery shopping. Defendant and the victim had separate rooms; the victim slept in the room with the bed and Defendant slept on a pallet in the other bedroom. Defendant described his relationship with the victim as "non-violent." He considered the victim "a father figure." He denied that their relationship became romantic after he moved in with the victim.

Defendant testified that on the evening of December 11, 2021, he and the victim were celebrating because Defendant had gotten a job as a front desk receptionist at a Holiday Inn Express. They celebrated over dinner with drinks and a couple of blunts of marijuana. Defendant stated that he was not a heavy drinker and only had one drink. The victim prepared the drinks.

Defendant testified that after having drinks, the victim told him that all of Defendant's family members and friends were dead which Defendant found to be "bizarre." Defendant guessed that the victim made the statement in an impaired state. Defendant believed that the victim was perhaps "testing" him to get a reaction out of him and to determine whether Defendant was impaired. Defendant recalled feeling "disoriented," "confused," and "hearing things." Instead of going to his room, Defendant went to the victim's room to lie down on the victim's bed next to the victim. The victim was already in his room watching television. Defendant explained that he went to the victim's bedroom because he thought it would be "safer" to be with someone he trusted in his disoriented state. He denied that he entered the victim's bedroom to kill him or to have sex with him.

Defendant testified that he fell asleep immediately but woke with his shorts pulled down, his legs up in the air, and the victim between his legs "doing stuff to [his] anus" and masturbating. Defendant testified that he was "in a paralyzed state" and could not move. He told the victim to stop "many times" but the victim refused. Defendant looked over to the side of the bed and saw a hammer leaning against the wall on the floor. He grabbed the hammer and struck the victim twice on the head "really fast[.]" Defendant had seen the autopsy photographs of the victim's head and acknowledged that he hit the victim "pretty hard."

Defendant then pushed the victim's body off his body and stood up. He said he was still disoriented and heard voices whispering to him. Defendant had watched the video of his police interview and confirmed that everything he told the officers about the voices had occurred as described. Defendant testified that the voices instructed him repeatedly to "break the mirror" to wake up. Defendant believed that he was in a dream state. He used the hammer to strike the mirror above the bathroom sink. He heard voices telling him that if he wanted to go "home," he had to cut or chop off "the head o[f] the snake," meaning

the victim's head. Defendant testified that he ran to the kitchen, grabbed a knife and began "to do the unthinkable," and cut off the victim's head.

He recalled telling the officers that he heard the victim still breathing after he hit him with the hammer. At trial, Defendant stated that the victim did not appear to be breathing. According to Defendant, the voices assured him that if he cut off the victim's head, he would wake from the "nightmare." After he cut off the victim's head, Defendant "panicked" and put the victim's body in a large suitcase to dispose of the body. He stated that had he been "in a normal state of mind," he would have called the police and reported "exactly what just happened," but he did not. Defendant confessed to removing the sheets from the bed because the sight of so much blood was "bothering [him]."

He eventually stopped cleaning the apartment and dragged the suitcase outside and tried to throw it in a dumpster. He testified that "it was dark out when everything happened[.]" Other than to get his backpack and some belongings, Defendant never returned to the victim's apartment. He camped out under the bridge at Madison Avenue for sixteen days until he was apprehended and brought to the station for the interview. Defendant stated that when he was taken into custody, he was still in "a very sedated, disoriented state" and continued to hear voices. He did not try to find another place to live because he believed that all his friends and family were dead. At trial, he testified that he no longer believed that his family and friends were dead.

Defendant testified that he "had enough" of being "disoriented," and despite what he told the officers at the interview, his "agenda" in walking to the Desoto County bridge was to jump off and kill himself. At the bridge, he recalled "making strong eye contact" with a woman who he believed may have called the police; he was crying on the bridge when the woman drove past and several police cars arrived thereafter. Defendant backed away as they approached because he did not believe that the officers were "real." He told the officers that he was "drugged." He did not resist as they grabbed him from the back, put him in handcuffs, and transported him to the police station.

Defendant was asked to address his "crazy" explanation for killing the victim in his interview with the officers:

Defense counsel: Then you get in the interview room and again, the jury got to see all that. There's a lot of talking about seeing ghosts and seeing entities. I mean, there's a lot of crazy talk. Let me start with this question. Do you have a history of any mental health issues?

Defendant: No, I do not.

Defense counsel: You didn't see any doctors and were diagnosed with anything as a child or as a teenager in high school or when you were in college?

Defendant: No.

Defense counsel: So, this is completely out of the blue?

Defendant: This is out of the blue. Just all of a sudden. Like if anyone that knows me saw that video would have immediately been, like, something's wrong. They would have knew (sic) something was wrong.

Defense counsel: Or, I mean, you can understand there's an interpretation that you were just making stuff up so that you'd look crazy. I don't know what that would help but you could see that interpretation; right?

Defendant: I can – I can understand that.

Defense counsel: Obviously you're sitting here now. I mean, you're able to communicate rationally what you remember and what you believed. What's changed since you've been in the jail?

Defendant: Well I was placed in general population and that didn't work out. I got beat up really bad by a guy that claimed I was –

Defense counsel: We don't need all those details.

Defendant: Okay. I was talking to myself I guess, claiming to see aliens and then the mental health professionals came and visited me and spoke with me, asked me some series of questions and then they placed me in mental isolation in the jail. So I was in this one-man mental isolated cell and I was in there for a couple of months. They placed me on post traumatic stress medicine Zoloft. They placed me on Abilify for hallucinations and Remeron

- 14 -

for the sleep deprivation because I was having trouble sleeping. I was scared to go to sleep.

Defendant testified that he was still taking the three medications which allowed him to think more clearly about what had occurred.

On cross-examination, Defendant confirmed that the victim was sick, not eating much, sleeping a lot, and was emaciated as documented in the autopsy photographs. Defendant denied that the victim was weak and frail but agreed that the victim was recovering from a two-week hospitalization shortly before his death.

During his direct examination testimony, Defendant did not state explicitly that he cut off the victim's head. On cross-examination, he confirmed that he hit the victim on the head with a hammer, cut off his head, put his body in a suitcase, and tried first to throw the suitcase containing the victim's body into the apartment complex dumpster and then rolled it down the alley and left the suitcase next to the dumpster behind the bank because he could not lift it.

He also confirmed that he cleaned the house by washing the floors, stripping the bed, and putting the bloodied sheets and other items in the washer. He also washed the knives and put them in the sink. Defendant "vaguely" recalled blood on the concrete outside but affirmed as captured on surveillance footage that he poured water from dog bowls on the concrete to wash away the blood. He also agreed that the footage showed Defendant rolling the suitcase to the apartment gates and returning to the apartment where he stayed inside for six minutes to gather some belongings. He left the apartment with a backpack, retrieved the suitcase at the apartment gates, and rolled it to the dumpster behind the bank.

Defendant denied that he told the officers in the interview that the victim was asleep when he hit the victim on the head with a hammer. He maintained that he did not "give a complete sequence of the events" to the officers and that when he said the victim was asleep, he was "g[i]v[ing] an example" of the victim's state when he was "possessed." He agreed that he told the officers that the victim was still breathing after he hit him on the head but insisted at trial that the victim was "lifeless."

On rebuttal and over Defendant's objection, the State called Stephanie Lovins Steiner, an employee of West Tennessee Forensic Services, and a certified forensic evaluator for the courts in Shelby County. Ms. Steiner, a licensed clinical social worker, was tendered as an expert in forensic mental evaluations and had evaluated Defendant for a competency assessment. She explained that to be found competent, a defendant must understand how the court works, be capable of conferring with his attorney, and

comprehend the charges and possible consequences if convicted. She explained that if a defendant displays an understanding of the judicial process, no further testing is warranted beyond the competency assessment. However, if there are "deviations" from competency, a defendant will undergo further assessments. In some instances, a defendant is specifically assessed for malingering which she defined as:

> [F]alsification . . . or profound exaggeration of illness both physical or mental to gain external benefits such as avoiding work or responsibility, seeking drugs or avoiding trial. It's commonly reported among prisoners who are avoiding trial or students who are trying to avoid school or workers trying to avoid work. It's usually to get an external gain. The individual fakes an illness. It can be [] physical or [] psychological [in] nature. So they consciously lie about their condition to get a benefit.

Ms. Steiner testified that she met Defendant three times and that another professional, Dr. Worley, saw him once. Based on the outcome of Defendant's competency assessment, he was assessed further. Ms. Steiner explained that Defendant was evaluated for competency at every meeting and that he underwent three tests for malingering in April 2022. Defendant was first tested under the Testing of Memory Malingering ("TOMM") wherein Defendant was shown pictures. Ms. Steiner explained that people with severe brain injury or dementia can score between 45 and 50. Defendant scored 7 out of 50 and 6 out of 50 which meant that he scored "far less than what chance is." She added that even if Defendant were guessing, he would have scored 25. She stated that any score below 25 is "a sign of someone who is presenting more impaired than they really are."

Next, Defendant was administered the Structured Inventory of Reported Symptoms (SIRS) test, a "very detailed assessment" to determine whether a defendant or a patient is feigning illness. Ms. Steiner testified that Defendant's scores on this test indicated that he was "endorsing a very wide range of psychiatric symptoms that reflected an unsophisticated attempt to appear mentally ill."

Finally, Defendant was administered the M-Fast Miller Forensic Assessment Tool, a twenty-five-item structured interview where a score less than or greater than six (6) would be considered "malingered psychopathology." Defendant scored an 18 which is "high" for malingering. After the assessments for competency and malingering, Ms. Steiner and the other professionals at West Tennessee Forensic Services concluded that Defendant "was presenting more impaired" than he really was.

Ms. Steiner had reviewed Defendant's records dating back to 2013, and there were no diagnoses of mental health issues. She also reviewed his jail medical records which

likewise showed no signs or symptoms of a mental disorder. Ms. Steiner observed that when Defendant met with her for an assessment, he would present himself as being impaired or "something completely different" from how he behaved in jail or the jail hospital. The jail hospital described Defendant as "quite friendly and alert and oriented."

On cross-examination, Ms. Steiner testified that Defendant was prescribed Zyprexa, an anti-psychotic, and Remeron, an anti-depressant. On redirect examination, Ms. Steiner explained that a prescription for an anti-psychotic does not necessarily mean that the patient has a psychosis. She explained further that Zyprexa is also prescribed for patients suffering from bipolar disorder. She testified that Defendant could be bipolar but there was nothing in his jail medical records to suggest that he was, or that he suffered from schizophrenia. She maintained that Defendant was diagnosed with depression and anxiety and "nothing else[.]"

Based on the proof, the jury convicted Defendant as charged in all three counts. The trial court, in its role as the thirteenth juror affirmed and approved the verdicts as to count one, first degree premeditated murder, and count three, abuse of a corpse, but dismissed count two, tampering with evidence.

*Sentencing – April 16, 2024*

At the sentencing hearing, the trial court announced that Defendant would receive an automatic sentence of imprisonment for life for the first degree murder conviction. The hearing thus focused on the sentence for abuse of a corpse. The State introduced Defendant's presentence report, and Bertram Jeffries and his son Burgess Jeffries, both family members of the victim, testified about the impact of the victim's death.

Defendant put on no proof but asserted that concurrent alignment of the sentences was proper based on Defendant's lack of prior felony convictions and the "actions in this particular case." Defense counsel argued that Ms. Steiner's trial testimony was "incorrect." The presentence report reflected in "Defendant's version" that Ms. Steiner lied in her trial testimony and that he had never taken Zyprexia for bipolar or any other disorder and that her testimony influenced the jury to find that he "did not suffer from psychosis."

The trial court noted that Defendant's record was "pretty unremarkable" with primarily traffic offenses and no felony convictions. Defendant had no contact with law enforcement since 2017. The trial court observed that the State had not filed a notice of enhancement factors but that the court was not precluded from considering any enhancement or mitigating factors.

The trial court applied five enhancement factors, first finding that the victim was "particularly vulnerable" because of age, physical, or mental disability. T.C.A. § 40-35-114(4). The trial court recalled that the victim was ill, had medical issues, and had lost some weight and by Defendant's testimony, the victim was not behaving in a manner that was normal for the victim. Second, the trial court found that Defendant had treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense. *Id.* § 40-35-114(5). The trial court recalled the testimony of the medical examiner regarding the autopsy findings. The victim suffered blunt force trauma to the head before Defendant decapitated the victim.

Third, the trial court found that the personal injuries inflicted upon the victim were particularly great. The trial court referenced the "absolutely horrific" photographs of the victim's body inside the suitcase and when the body was removed from the suitcase. *Id.* § 40-35-114(6). Next, the trial court found that Defendant possessed a deadly weapon during the commission of the offense. The trial court referenced Defendant's testimony about the weapon he used to strike the victim in the head. The trial court imagined the weapon to be a "gavel type instrument" which Defendant used like a hammer. *Id.* § 40-35-114(9). Finally, the trial court found Defendant had no hesitation about committing a crime when the risk to human life was high. *Id.* § 40-35-114(10). The trial court found "unbelievable" Defendant's testimony that he awoke to the victim doing something inappropriate or sexual. The trial court recalled that Defendant considered the victim "a father figure" and that the two of them had no issues while Defendant was living in the victim's home.

The trial court also considered mitigating factors, accepting as true that Defendant was on a variety of medications. The trial court recognized Defendant's report of adverse childhood experiences as included in the presentence report and noted that Defendant may not be well, but "not so unwell that he did not appreciate what he was doing."

The trial court then found that Defendant was a dangerous offender and ordered the two-year sentence for abuse of a corpse to run consecutively to the sentence of life imprisonment. *Id.* § 40-35-115(b)(6). Specifically, the trial court found that the circumstances of the commission of the offense were aggravated and that confinement for an extended period of time was necessary to protect society from Defendant. The court noted that Defendant "show[ed] this [c]ourt zero remorse" and found that the aggregate length of the sentence was reasonably related to the offenses for which Defendant was convicted. Defendant filed a timely motion for new trial and a timely notice of appeal from the denial of the motion for new trial. This appeal is properly before the court.

# Analysis

## I. Motion to Suppress

Defendant maintains that the trial court abused its discretion in denying his motion to suppress his statement to Sergeant Freeman and Sergeant Burdett. He argues that he unequivocally asserted the right to counsel multiple times, but the officers continued the interview and questioned him for over three hours. The State argues that Defendant's requests for counsel were ambiguous because he asked for counsel only in relation to specific questions and when asked by the officers to clarify his request, Defendant continued the interview and said that he wanted to "share a story." We agree with the State.

The basis of Defendant's suppression motion was Defendant's assertion of the right to counsel. The right to counsel and the right against self-incrimination are guaranteed under both federal and state constitutions. The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself" and also encompasses the right to counsel "during police-initiated custodial interrogation." *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). Statements made during a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's decision to waive the right to counsel and the right to remain silent must be made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). Accordingly, should a defendant clearly and unequivocally invoke either the right to counsel or the right to remain silent, the interrogation must end immediately. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 459 (1994).

Whether or not an accused has invoked his right to counsel during interrogation is an "objective inquiry." *Davis*, 512 U.S. at 459. "The accused 'must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney.'" *State v. Saylor*, 117 S.W.3d 239, 245 (Tenn. 2003) (citing *State v. Huddleston*, 924 S.W.2d 666, 670 (Tenn. 1996)). "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)); *Huddleston*, 924 S.W.2d at 669. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances

would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease, nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Davis*, 512 U.S. at 459 (emphasis in original). "[G]enerally statements have not been found to be a clear and unambiguous invocation of the right to remain silent when they . . . 'indicate only the suspect's desire to avoid answering a particular question or to avoid speaking about particular themes[.]'" *See State v. Lalone*, No. E2016-00439-CCA-R3-CD, 2017 WL 2297653, at *12 (Tenn. Crim. App. May 25, 2017).

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* (quoting *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010)). As the trier of fact, the trial court "is entrusted with determining the credibility of the witnesses, weighing the evidence, and resolving conflicts in the evidence, and it is not this [c]ourt's job to second-guess these determinations." *State v. Clark*, 452 S.W.3d 268, 282 (Tenn. 2014) (citing *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012)). However, "[d]espite the deference given to [a] trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness." *State v. Henry*, 539 S.W.3d 223, 232 (Tenn. Crim. App. 2017). Moreover, if the trial court's findings are based solely on evidence not requiring credibility determinations, the review of the evidence is de novo without a presumption of correctness. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)); *see State v. Turner*, 305 S.W.3d 508, 514 (Tenn. 2010) (applying de novo review because the trial court's determination was based on video evidence included in the appellate record), *abrogated on other grounds as recognized by State v. Climer*, 400 S.W.3d 537, 562 (Tenn. 2013); *State v. Collins*, No. W2020-01566-CCA-R3-CD, 2022 WL 1183803, at *5 (Tenn. Crim. App. Apr. 21, 2022), *no perm. app. filed*.

"[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). If the trial court's order denying the motion to suppress is not in the appellate record, the reviewing court may examine the trial court's oral ruling from the suppression hearing transcript if the oral ruling sets forth findings of fact and conclusions of law that explain the trial court's reasoning. *State v. Austin*, No. M2018-00591-CCA-R3-CD, 2020 WL 6277557, at *1 n.3 (Tenn. Crim. App. Oct. 27, 2020) (holding arguments of the parties at the suppression hearing and the trial court's oral findings of fact and conclusions of law were sufficient for this court to address the suppression issues where the appellate record did not include the motion to suppress, the State's response, and any written order by the trial court).

In this case, the suppression hearing included testimony from Sergeant Freeman regarding the circumstances of the recorded interrogation. Therefore, de novo review of the facts is not necessary. *Clark*, 452 S.W.3d at 282. Furthermore, although the trial court's order denying the motion is not in the record, the court's oral findings from the transcript of the suppression hearing are sufficient for this court to conduct meaningful appellate review.

In denying Defendant's motion to suppress his statement, the trial court concluded that Defendant's requests for an attorney were equivocal and ambiguous:

> And what I see here, is he says at least four times in what we just watched -- I may have missed a few, but he says at least four times in his invocation, or what he believed to be an invocation -- what MPD probably didn't consider as an invocation. He says: That question.
>
> After he says they're all dead, and then at 43 [minute mark] he says this is going to sound insane, dot, dot, dot, on that question. I don't want to answer that question. Then he talks about the ghost at 34:44: Not going to answer that question. So that's at least four. And then again at 31 [minute mark], because they're now discussing the -- the ghost tormenting him and the fact that he's seeing these ghosts.
>
> But we can't take away from the fact that he absolutely did say: I want a lawyer. There is but a very, very slight pause before he launches into: I would like to share my story at 30:28. But if you watch carefully, he says -- at 30:06, he invokes. You say there were ten seconds there when you see him retreat into himself. They both start talking at the same time reinitiating this discussion. All -- when I say both I mean all three.
>
> They both try to get clarity because he's made an unambiguous statement -- he's made an ambiguous statement as it relates to that question as he's talking about the family. All questioning should have ceased, but at that exact moment when the officers start saying and trying to attempt to get clarity on what exactly he's invoking, they cut him off.
>
> He starts talking then, way back. They both start: Well, you don't have to. They both start talking at the same time, both officers, and he opens his mouth. They interrupt him. There's like a millisecond of time that lapses: I would like to share a story.

- 21 -

Better practice would've been for MPD to stop after the first I want my lawyer. That was clear to me. The continued discussion about possibly dead friends and families and ghosts and demons, while it may not have been what brought [Defendant] to the attention of the police, they're trying to get information from him which they initially are successful at doing.

I'm not suppressing the statement. I do believe it was un – it was not equivocal (sic). It was ambiguous because he was only specific as to the questions that were posed about the family. I'm not answering that question; I'm going to need a lawyer for that question. Where are my notes?

He wasn't clear when he said I'm not going to answer any, but he did prior to. I'm giving him that. The Rule requiring that police cease all questioning upon invocation of the right to remain silent only applies when the -- when the suspect makes a clear and unambiguous invocation of the right to remain silent.

There was no break in custody, so I can't even consider that. That's just a part of something that the [c]ourt has to think about. He was sitting there the entire time, but I want you to roll the tape back in your free time and see what I saw when they both start talking at the same time and he launches into: I want to share a story.

Questioning may also resume after invocation of the right to counsel if the suspect initiates the further questioning. I don't even know if you could say he initiated further questioning as much as he continued to speak against his own interests.

The evidence does not preponderate against the trial court's factual findings. Defendant voluntarily and knowingly waived any invocation of his right to counsel first, by qualifying his request for counsel, and second, by initiating further dialogue.

Defendant asserts that he invoked his right to counsel clearly and steadfastly multiple times, but Sergeant Freeman and Sergeant Burdett failed to end the interrogation and instead continued to question him. Our review of the recording shows that Defendant expressed an audible request for counsel twice during the interrogation. The first request occurred four minutes into the interview when Sergeant Burdett asked Defendant for the names of his family and friends. Defendant responded, "I don't want to answer any questions right now. I want a lawyer." As the trial court noted, all three men began talking at the same time and then Sergeant Freeman asked Defendant to clarify whether he wanted a lawyer. Defendant conditioned his request: "Certain questions I will answer, certain

questions I just won't." As the interview continued, Defendant responded to certain questions about his family that he did not want to answer by telling the officers just that.

The second request for counsel occurred when Defendant told the officers that he had seen someone hurt his sister. When Sergeant Freeman pressed him to identify who had hurt his sister, Defendant stated, "I'm gonna need a lawyer. This is all designed to make me look crazy." Sergeant Burdett asked Defendant if he wanted a lawyer "for everything or just that question?" Both officers remained quiet as they waited for Defendant's reply; when Defendant responded that he wanted to tell "a story," the interview continued. We observe that the conduct of both officers toward Defendant was respectful and courteous.

An invocation of the right to counsel can be limited. *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987).

> [A]fter a limited invocation, interrogation can continue on topics not covered by the invocation. If the suspect, without prompting from law enforcement, then voluntarily reinitiates discussion of a covered topic and waives [his] previously invoked rights, it "is quite consistent with the Fifth Amendment" for the suspect's statements about a covered topic to be admissible at trial.

*United States v. Rought*, 11 F.4th 178, 183 (3d Cir. 2021). Based on our review of the video-recorded interview, Defendant made, at best, a limited invocation of his right to counsel. Defendant qualified his requests for an attorney by answering only certain questions. When asked directly whether his request applied to questions about his family or to the interrogation as a whole, Defendant voluntarily proceeded to tell "a story." The trial court did not err by denying Defendant's motion to suppress his statement. He is not entitled to relief.

## II. Testimony of State's Rebuttal Witness

Defendant contends that permitting Ms. Steiner to testify as a rebuttal witness was an abuse of discretion because her testimony was irrelevant and a violation of privileged communication between a patient and a psychiatrist or psychologist, which would deter defendants from being honest and transparent when being evaluated. The State argues that Ms. Steiner's testimony was relevant to rebut Defendant's mental condition claim. The State adds that Defendant's claim that his communication with Ms. Steiner is protected is waived because he raises it for the first time on appeal. We agree with the State as to both arguments.

- 23 -

The trial court has broad discretion to allow rebuttal testimony, as well as the scope of that testimony should such testimony be admitted. *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000). The trial court's ruling on rebuttal evidence will not be overturned absent an abuse of discretion. *State v. Kendricks*, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996); *State v. Dellinger*, 79 S.W.3d 458, 488 (Tenn. 2002). "Rebuttal evidence is 'any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" *Thompson*, 43 S.W.3d at 524 (quoting *Nease v. State*, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). "Like any other evidence, rebuttal evidence must be relevant and material to the facts at issue in the case." *State v. Lunati*, 665 S.W.2d 739, 747 (Tenn. Crim. App. 1983). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Usually, relevant evidence will be admissible. Tenn. R. Evid. 402. However, relevant evidence will not be admitted if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

In general, statements made by a defendant during a mental examination are inadmissible against the defendant except for purposes of impeachment or to rebut proof concerning a mental condition introduced by the defendant at trial.[6] *State v. Reid*, 981 S.W.2d 166, 172-73 (Tenn. 1998) (citing *State v. Huskey*, 964 S.W.2d 892, 899-900 (Tenn. 1998)).

We find no abuse of discretion in the trial court's admission of the rebuttal evidence. The trial court found that Defendant opened the door to Ms. Steiner's testimony when Defendant was asked whether he had a history of mental illness or had been diagnosed with a mental condition. However, the trial court also agreed with defense counsel that defendants should feel free to seek treatment without fearing their statements would be used against them in a criminal proceeding. The trial court allowed the State to call Ms. Steiner as a rebuttal witness but prohibited the witness from including any statement Defendant made about the case. Ms. Steiner limited her testimony to the results of the three tests she administered to Defendant following an assessment for competency. Her testimony about the results of the tests on malingering and the medications he was taking was in response to Defendant's testimony that he had been diagnosed with a form of psychosis and about the medications he took for various mental conditions. Her testimony was relevant and was used to impeach or rebut Defendant's claim of psychosis. She offered no testimony regarding the facts of the case or any statements Defendant made about the

---

[6] This is the general rule of a court-ordered mental evaluation under Rule 12.2 of the Tennessee Rules of Criminal Procedure. Because neither party is relying on Rule 12.2 in addressing this issue, we will refrain from addressing the issue under the rule.

case. The trial court did not abuse its discretion in permitting the State to call Ms. Steiner as a rebuttal witness.

As to Defendant's claim that conversations and testing conducted for a mental assessment constitute "privileged communication," because Defendant raises this argument for the first time on appeal, it is waived. Tenn. R. App. P. 36(a); *State v. Adkisson*, 899 S.W.2d 626, 635-36 (Tenn. Crim. App. 1994). We decline to exercise our discretion in reviewing for plain error, especially where no "particularly compelling or egregious circumstances" exist to warrant review and where Defendant has not addressed the matter for plain error despite raising it anew on appeal. *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*. Defendant is not entitled to relief.

### III.     Sufficiency of the Evidence

Defendant contends the evidence is insufficient to support a conviction for first degree murder but is suitable for a conviction on a lesser-included offense; however, he does not identify the lesser offense. He also argues that he was "defending" himself from either the victim or the "entities" and, therefore, lacked premeditation. The State argues that the evidence is sufficient to support a premeditated murder. We agree with the State.

The relevant question the reviewing court must answer in a sufficiency issue is whether *any* rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (first citing Tenn. R. App. P. 13(e); and then citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[A] guilty verdict 'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017)). As such, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021); *State v. Curry*, No. W2022-00814-SC-R11-CD, -- S.W.3d --, 2025 WL 47521, at *3 (Tenn. Jan. 8, 2025). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Allison*, 618 S.W.3d 24, 34 (Tenn. 2021); *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019). Thus, this court refrains from re-weighing the evidence when evaluating the convicting proof. *McKinney*, 669 S.W.3d at 772-73; *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *Dorantes*, 331 S.W.3d at 379). On appeal, the defendant bears the burden to demonstrate why the evidence is legally insufficient to support the

conviction. *Curry*, -- S.W.3d --, 2025 WL 47521, at *3; *McKinney*, 669 S.W.3d at 773; *Jones*, 589 S.W.3d at 760.

Defendant challenges only his conviction for first degree murder. First degree murder is the "premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). "Premeditation" is defined as:

> The intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). As this court has found, "[p]roof of premeditation is inherently circumstantial." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). "The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *Id.* The following are non-exclusive factors a jury may consider to infer premeditation: (1) use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) declarations by the defendant of an intent to kill; (4) evidence of procurement of a weapon; (5) preparations before the killing for concealment of the crime; (6) calmness immediately after the killing; (7) a lack of provocation on the victim's part; and (8) a defendant's failure to render aid to a victim. *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017) (first citing *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); and then citing *Finch v. State*, 226 S.W.3d 307, 318-19 (Tenn. 2007)).

In this case, the State presented the jury with sufficient evidence to conclude that Defendant acted with premeditation when he killed the victim. Viewing the evidence in the light most favorable to the State, the jury could have inferred premeditation based on the lack of provocation by the victim. Defendant told Sergeant Freeman and Sergeant Burdett that the victim was asleep in his bed when Defendant struck him with the hammer. The autopsy showed no defensive wounds on the victim's body. Even assuming the jury somehow believed Defendant's account that he was being sexually assaulted or was attacked by "entities," the jury could have formed the conclusion Defendant acted with premeditation by procuring a deadly weapon and using it on the unarmed victim. Defendant attacked a victim who was not only unarmed, but had recently been hospitalized, was diabetic, not eating, and clearly emaciated at the time of his death as documented at trial.

Furthermore, Defendant took steps to rid himself of the evidence implicating himself in the victim's death. He stripped the bed of the bloody linens, washed the knives, and tried to clean the victim's apartment. He cut off the victim's head, stuffed the victim's body and the detached head into a suitcase, and tried to dump the suitcase in two different dumpsters. As the trial court found at sentencing, Defendant's actions after the killing took planning, strategy, and work. The trial court noted that these actions reflected calmness after the murder, yet another indicator of premeditation. The evidence sufficiently supports Defendant's conviction for first degree murder. Defendant is not entitled to relief.

## IV.    Sentencing

Defendant complains that the trial court's imposition of consecutive sentencing based upon its finding that he was a dangerous offender was an abuse of discretion. While he does not dispute the imposition of the two-year sentence for the E felony conviction, Defendant argues that a sentence of life plus two years was improper because he lacks an extensive criminal history, and the trial court relied too heavily on the circumstances of the convicted offenses. The State argues that the sentence is presumptively reasonable because each sentence is either within the correct range of punishment or the permissible sentence under the law, and the trial court stated its reasons which are supported by the record. We agree with the State.

This court reviews a trial court's decision on consecutive sentencing under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). The presumption of reasonableness applies where a trial court "properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review[.]" *Id.* at 862. This means that the reviewing court will give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861.

As relevant to this case, the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995). "The adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement." *Pollard*, 432 S.W.3d at 863. In order to limit the use of the "dangerous offender" category to cases where it is warranted, the trial court must make

specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

When imposing consecutive sentences, the trial court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfield*, 70 S.W.3d 698, 708 (Tenn. 2002).

The record shows the trial court made findings premised on Defendant's lack of truthfulness and lack of remorse for killing the victim. The trial court also specifically discussed Defendant's planning, work and strategy, observing that Defendant "had the wherewithal to not only murder [the victim], but cut his head off, stuff him in a suitcase, dump him at dumpster number one (sic) in broad daylight on camera, move him again to a second dumpster." The court found that "[n]othing [Defendant] has given us as a reason for why this happened is believable." The trial court also noted that even though Defendant did not have a significant prior criminal history, the circumstances surrounding the commission of the offense were aggravated, Defendant showed no remorse, and that confinement was necessary to protect society from his unwillingness to lead a productive life.

We conclude that the facts adduced at trial and sentencing support the conclusion that Defendant is a dangerous offender as contemplated by the statute and that a sentence of life imprisonment plus two years is reasonably related to the severity of the offenses. Here, Defendant viciously and repeatedly struck the elderly, frail, unarmed victim on the head with a hammer as the victim lay sleeping. Such behavior shows little or no regard for human life and involves a high risk to life. *See State v. Alexander*, 957 S.W.2d 1, 8 (Tenn. Crim. App. 1997) (finding under de novo review that the defendant's act of stabbing the victim multiple times and beating her with a claw hammer was indicative of a dangerous offender to warrant consecutive sentencing).

Moreover, the horrific circumstances of the killing and Defendant's lack of remorse and truthfulness supports the trial court's finding of the public's need to be protected from Defendant. After striking the victim on the head, Defendant used a knife to decapitate the victim, folded his body and severed head into a suitcase. In broad daylight, he dragged the suitcase to two different dumpsters in an attempt to discard and hide the body. *See* T.C.A. § 40-35-103(5) (providing that a defendant's potential for rehabilitation is a necessary consideration for sentencing). Based on the record before us, the trial court did not abuse its discretion in finding that the aggregate sentence is "reasonably related to the severity of

the offenses." *Pollard*, 432 S.W.3d at 863 (citation omitted).  Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.


s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE